

**U.S. Department of Justice**
*United States Attorney*
*District of New Jersey*

---

*Christopher Amore*
*Benjamin Levin*
*Assistant United States Attorneys*

*970 Broad Street, Suite 700*     *(973) 645-2700*
*Newark, New Jersey 07102*

December 8, 2022

*****FILED ON ECF***

The Honorable John Michael Vazquez
United States District Judge
Post Office & U.S. Courthouse
2 Federal Square
Newark, New Jersey 07102

      Re:    *United States v. Omar Alkattoul*
            Crim No. 22-797 (JMV)

Dear Judge Vazquez:

The Government respectfully submits this letter brief in opposition to the Defendant Omar Alkattoul's ("Alkattoul" or the "Defendant") motion ("Def. Motion") to revoke the order of detention issued by Magistrate Judge Jessica S. Allen in *United States v. Alkattoul*, Mag. No. 22-8385 (ECF No. 7) on November 10, 2022.

The Defendant poses a danger to the community and the proposed bail package is insufficient to ensure the safety of the public. The Defendant transmitted via a social media application a manifesto containing threats to attack a synagogue. Those threats were sufficiently serious and credible that they triggered a state-wide warning to Jewish community leaders and to the public at large from the Federal Bureau of Investigation ("FBI"). Importantly, portions of the manifesto were written in the past tense, as if the manifesto were to be found after an attack and used to explain the Defendant's motives for committing such an attack on a synagogue, as done by other notorious mass murderers. Moreover, given the strength of the evidence in the case and the potential prison sentence associated with the charge if convicted, the Defendant poses a flight risk.

Accordingly, as set forth below, there is clear and convincing evidence that no condition or combination of conditions can reasonably assure the safety of the community if Alkattoul is released. *See* 18 U.S.C. § 3142(e)(f). Additionally, by a preponderance of the evidence, there is no condition or combination of conditions that can reasonably assure the presence of the

Defendant at trial.  *See* 18 U.S.C. § 3142(f); *United States v. Himler*, 797 F.2d 156, 160-61 (3d Cir. 1986).  Accordingly, the Defendant's motion should be denied, and the Defendant should remain detained pending trial.  *See* 18 U.S.C. § 3142(e).

## I.  **Background**

### a.  **The Criminal Complaint and Offense Conduct**

The Defendant is charged in a Complaint, Mag. No. 22-8385 (JSA) (the "Complaint"), with Transmitting a Threat in Interstate and Foreign Commerce, in violation of Title 18, United States Code 875(c). The Complaint is attached hereto as Exhibit A.  For the Court's convenience, the substance of the Complaint is set forth below.

The Complaint alleges that on or about November 1, 2022, the Defendant used a social media application ("Application-1") to communicate with another user of Application-1 ("Individual-1").  During the conversation between the Defendant and Individual-1, the Defendant referred to a document that the Defendant had been writing.  The Defendant told Individual-1, "I actually started writing it a long time ago.  If you want I will link it.  It's in the context of an attack on Jews."  Shortly thereafter, the Defendant sent Individual-1 a link to a document entitled "When Swords Collide" (the "Document").  In an interview with law enforcement on or about November 4, 2022, the Defendant admitted that he had drafted the Document and sent it to Individual-1.

A second individual ("Individual-2"), who communicated with the Defendant on another social media application ("Application-2"), informed law enforcement that he/she communicated with the Defendant in a "server," or "channel" on Application-2, which allows users of Application-2 to communicate with groups of other users.  According to Individual-2, the Defendant shared a link to the Document in the server with four individuals in addition to Individual-2.  Individual-2 stated that he viewed the Document. Individual-2 also stated that the server where the Defendant shared the Document may have had 20 members at one point.

Further, according to Individual-2, the Defendant told Individual-2 that he wanted to kill in an "act of revenge" for the death of Muslims.  In or around early October 2022, Individual-2 asked the Defendant about his plan for an attack.  The Defendant claimed that he no longer wanted to do it.  On or about October 5, 2022, the Defendant used a different social media application to send Individual-2 an audio recording of the Defendant speaking in Arabic.  The recording has been translated into English as follows:

> With God's permission, we will conquer Andalusia, O
> French!  And we will conquer Jerusalem, O Jews.
> With God's permission, he will slaughter you, O swine
> and monkeys, God damn you.  And I pledge allegiance
> to Abu-Hasan al-Hashimi al-Qurayshi,[1] may God
> protect him; and I will obey him during  hard times
> and good times.  With God's permission, the Jews will
> be frightened; the promise is near.

On or about November 4, 2022, law enforcement reviewed a copy of the Document on the Defendant's iPhone pursuant to a consensual search.  In a section of the Document titled "Introduction," the Defendant stated, among other things, the following:

> All praise is due to Allah SWT,[2]  I am the attacker
> and I would like to introduce myself. . . I am a Muslim
> with so many regrets but I can assure you this attack
> is not one of them and Insha'Allah[3] many more
> attacks like these against the enemy of Allah and the
> pigs and monkeys will come.

In a section of the Document titled "The target," the Defendant stated, among other things, the following:

> I will discuss my motives in a bit but ***I did target a
> synagogue for a really good reason according to
> myself and a lot of Muslims who have a brain.***
> Let's be aware of the fact that the Jews promote the
> biggest hatred against Muslimeen even in the west.
> The Jews are in fact a very powerful group in the west
> which is why western countries today shill for them on
> top of the murtadeen[4] in Saudi Arabia and every Arab
> country.  (Emphasis added).

---

1 Al-Khurayshi refers to Abu al-Hasan al-Hashimi al-Quarashi, who is the third and current caliph of the Islamic State (ISIS).

2  "SWT" refers to "Subhanahu wa ta'ala," which translates generally from Arabic as "Glory to Him, the Exalted."

3  "Insha'Allah" translates generally from Arabic as "if Allah (God) wills" or "God willing."

4  "Murtadeen" translates generally from Arabic as "apostate," which is one who renounces religious or political beliefs or principals.

In a section of the Document titled "The motive of the attack," the Defendant stated, among other things, the following:

> ***This attack was just to remind the Jews that as long as 1 Muslim remains in this world they will never live a pleasant life until the Muslims in Palestine, Syria, West Africa, and South Asia are living a pleasant life.*** The Jews support terror against the muslimeen and always have . . . . So the motive of this attack is hatred towards Jews and their heinous acts and I don't want anyone to tell me for a second that "not all Jews support terror against Muslims" yes they do!   They have since day one. Their Torah justifies their acts and let's keep in mind it was a Jew that tried to kill the nebi SAW.[5] (Emphasis added).

The Complaint further alleges that other sections of the Document contained the following titles:

- "Why hatred towards Jews is a good thing even if they're not Zionists"
- "The right-wing ideology of the Jews"
- "The term 'anti-Semitic' and it's true meaning"
- "The 'Holocaust'"
- "The 'good' Jews," in which the Defendant states, "Good jews do not exist unless if they convert to Islam. . . .  I hate jews based on their actions and their religion that justifies the actions they do."

In a section of the Document titled "The Heroes," the Defendant stated, among other things:

> . . . when I say "heroes and lions" I am referring to Osama Bin Laden, Abu Musab al-Zarqawi, Abu Bakr al-baghdadi, Abu Muhammad al-Adani, Anwar al-Awlaki, Abu Omar al-Shishan, Mullah Omar and

---

[5] Referencing Muhammad, believed to be the last Prophet and Messenger of God.

Abdullah Azzam[6] . . . and of course the lone wolf
muwahideen[7] who have made the kuffar[8] shook.

In a section of the Document titled "Religion of peace," the Defendant
stated, among other things, ". . . I as a Muslim and disbeliever in the taghut,[9]
I support terrorism against the kuffar and the enemies of the deen."[10]

The Document also has a section titled, "A Small Few Questions for
Omar, Pt 1."  One of the questions and corresponding answer is as follows:

> Q:  Why have you chosen to carry this attack on behalf
> of ISIS?
>
> A:  It's not "ISIS" it is the "Islamic State".  I chose to
> do it on behalf of them because they're legitimate
> mujahideen[11] unlike modern day al-Qaeda and
> Taliban.

On or about November 3, 2022, law enforcement agents interviewed the
Defendant at his residence.  He made the following statements, in substance
and in part:

a.  He stated he was "radicalized" over the course of approximately one
year after viewing posts on Application-2 that contained screenshots
of a video showing Kahane-ists laughing and sharing photos of dead
Arab children and praising the people who killed them.[12]  Alkattoul

---

[6] All various leaders and/or spokespersons for al-Qaeda, The Taliban and/or
ISIS.

[7] "Muwahideen" translates generally from Arabic as "monotheist."

[8] "Kuffar" translates generally from Arabic as "unbeliever/non-Muslim/infidel."

[9] "Taghut" is a term that is specifically used to denounce everything that is
worshiped instead of Allah.  It is often used in reference to an oppressive
government.

[10] "Deen" translates generally from Arabic as the religion or belief of a Muslim.

[11] "Mujahideen" translates generally from Arabic as guerrilla fighters in Islamic
countries, especially those who are fighting against non-Muslim forces.

[12] "Kahane-ists" were followers of Meir Kahane, who, according to ALKATTOUL,
believed that Jewish people were superior to others.  He also told law

also stated that he used an encrypted social media application ("Application-3") to view ISIS propaganda, and to communicate with others who were encouraging him to carry out an attack. Specifically, Alkattoul stated that he had communicated with an individual ("Individual-3"), who Alkattoul believed was affiliated with al-Qaeda and located in Pakistan, and an individual in Germany ("Individual-4"), who introduced Alkattoul to Individual-3.

b. Individual-3 provided Alkattoul with documents and information on how to protect his iPhone and phone applications from being detected by law enforcement. Alkattoul stated that, based on the information provided, he had taken steps to conceal his iPhone communications and data, including changing his web search engine.

c. Alkattoul communicated to Individual-3 that he (Alkattoul) could conduct an attack on Jewish or gay people, but claimed that he did not have adequate resources to do so. Specifically, Alkattoul stated that he told Individual-3 that he (Alkattoul) could attack synagogues or gay clubs. Alkattoul told law enforcement that he considered an attack on a synagogue in New York but would need two years to prepare for such an attack. Alkattoul said that he researched how to obtain a gun, shooting ranges, and mass shootings. He also said that if he were to conduct an attack, it would be a shooting attack. He said he would not feel bad for the victims but would feel bad for the families of the victims. Alkattoul claimed that as of October 29, 2022, he was about "50/50" on whether or not he would commit an attack.

d. Alkattoul described a terrorist as someone who killed or hurt people. He claimed that he was not a terrorist, but admitted that he had previously posted in Application-3 that God cursed the Jewish people and God should burn gay people. He told law enforcement that in September 2022, he posted in a group chat in Application-3 that he would punch in the face or curb stomp the next "f****t" he saw. He claimed that the group chat consisted of individuals who were "LARP-ing" as terrorist/jihadis. He explained that "LARP-ing" was live-action role playing.

e. Alkattoul also admitted that he posted on Application-3 that he would throw a Molotov cocktail on a Jewish person, but claimed that

---

enforcement that if he found where the Kahane-ist headquarters was located, he would burn it to the ground, but then claimed that he "didn't have the balls" to do that.

it was in a joking manner.  He also claimed he would not actually do it because he did not want to disappoint his family.  He further claimed that he did not "have the balls" to commit such an act, especially after "this visit" from the FBI.  Alkattoul additionally claimed that he did not want to serve a prison term, get shot, or die.

f.  Alkattoul admitted that he had seen information about making bombs posted in the Application-3 group chat, but he had never personally looked into making a bomb or posted information about bombmaking.  He admitted that on or about October 23, 2022, he posted a statement in Application-3 saying that he wanted to throw a bomb on Hizballah because they were Shia, and he did not like Shiites because of their beliefs.  He then claimed, "but let's be honest, I'm not man enough to act on any of this."

g.  Alkattoul also stated that he would not give money to individuals who wanted to commit an act of violence.  He admitted that he had hostility but would not be violent himself.  He claimed that if he heard about someone wanting to do something violent, he would tell them not to do it because he would feel bad if they got arrested or killed.  Alkattoul said, however, that he would not feel bad for the victims of violence.

h.  Alkattoul claimed that he would not actually commit the acts of violence about which he posted on Application-3.

i.  In response to law enforcement's question as to whether Alkattoul planned to conduct an attack, Alkattoul responded that it was a "possibility" and that he wanted to get to that point as quickly as possible, but then claimed that he did not really want to conduct an attack as soon as possible.

On or about November 4, 2022, law enforcement conducted another interview of Alkattoul.  During that interview, Alkattoul made the following statements, in substance and in part:

a.  Alkattoul admitted that he created the Document, but claimed that this was done while LARP-ing.  Alkattoul stated that he wrote the Document in five days.  He claimed that he imagined being al-Qaeda and carrying out an attack.  He further claimed that he wrote the Document in the first person in the context of being a leader.

b.  When Alkattoul was asked if he would carry out an attack if he had his own money and did not live with his parents, he claimed that he would not. When asked if the Document was real or fake, he replied

that part of it was real, but he then claimed that it was fake.

During both interviews, Alkattoul gave consent to law enforcement to search several electronic devices, including an iPhone. The consensual search, as well as the search of Alkattoul's iPhone pursuant to a court-authorized search warrant, revealed the following:

a. Between on or about August 4, 2022 and on or about August 21, 2022, Alkattoul exchanged a series of private messages over Application-3 with another user of Application-3 ("Individual-5"). Alkattoul stated, ". . . I know my target but idk [I don't know] the location." In response to Individual-5's question, "U planning an attack?", ALKATTOUL responded, "Yes." Alkattoul further told Individual-5 that the attack would not happen for about six to seven years because he needed to plan it and gather resources. He stated, "Well you see I want this attack to be affiliated with AQ [al-Qaeda]." Alkattoul added that he would later specify "this attack and the motive," and that the attack was in retaliation for the New Zealand mosque shootings in Christchurch on March 15, 2019. He noted that the attack would involve bombings, shootings, and "maybe" beheadings.

b. On or about August 29, 2022, Alkattoul sent a private message on Application-3 to Individual-2, stating, "As a Muslim I support Dylann Roof[13] because he went in a n****r Christian Janiya type church and killed 10 Christcucks while being an atheist, a lot Muslims in the west should learn from him."

c. On or about August 30, 2022, Alkattoul sent a private message on Application-3 to another user of Application-3 ("Individual-6"). The message contained a video and photo montage of Dylann Roof. In response, Individual-6 stated, "[M]e in [S]hia mosque." Alkattoul then responded, "Me in church and synagogue."

d. On or about October 4, 2022, Alkattoul searched for an Arabic-English translation of "[b]y God, I will slaughter you, O Jews."

e. On or about October 16, 2022, Alkattoul searched the Internet for "beslan school seige," which referred to a terrorist attack on a school in Beslan, Russia in 2004, in which 333 people were killed, including 186 children.

---

[13] Dylann Roof is an American white supremacist Neo-Nazi convicted for hate crimes for the shooting murders of nine people in a South Carolina church on June 17, 2015.

f.  On or about October 20, 2022, Alkattoul searched for a foreign language translation of "I hate Jews, and I love the Islamic state."

g.  On or about October 21, 2022, among other things, Alkattoul's web history revealed the following: "aq [al-Qaeda] attack on jewish school france."

h.  On or about October 27, 2022, Alkattoul received a message on an encrypted messaging application ("Application-4") from Individual-3, who was also using Application-4.  The message stated, "brothers told me u will @ttck in US."  On or about October 29, 2022, Alkattoul responded: "Yeah so basically about 2 months ago I told [Individual-4] and [another individual ("Individual-7")] that I was planning an attack but it's gonna take me years to prepare for it because I don't have items and my parents do not like guns.  I said I could be targeting a synagogue or gay night club.  And this would be AQ [al-Qaeda] affiliated attack."  Alkattoul also stated to Individual-3, ". . . I've been thinking about jihad for a while now and I just came to this conclusion of how and where. . . . And I am taking a class in college next year that teaches how to hack and how to go on the dark web and I feel like that would be useful and somewhat relevant in going on jihad."  Alkattoul also stated, "[Individual-7] sent me inspire[14] pdf magazines."

i.  On or about October 29, 2022, Alkattoul sent a message via Application-3 to Individual-2, who also had an account with Application-3:  "I got messaged by AQ [al-Qaeda]. . . .  I'm try[ing] [to] explain to the guy that I can't go and attack but he's urging me to . . . TTP[15] recruitment."  Alkattoul also sent Individual-2 a screen capture of the conversation with Individual-3.

After the interview with law enforcement, while voluntarily in an ambulance during transport to the hospital for an examination, Alkattoul told the ambulance personnel that he supported ISIS and al-Qaeda.

Upon arrival at the hospital, Alkattoul told a hospital employee ("Employee-1") during the intake process that Alkattoul identified with the ideologies of ISIS and al-Qaeda.  He also told Employee-1 that he had been

---

[14] "Inspire" is an English language online magazine published by al-Qaeda. The magazine is one of the many ways that al-Qaeda uses the Internet to reach its audience.

[15] "TTP" is believed to reference "Tehrik-e Taliban Pakistan," which is a group of militant Taliban networks formed to oppose the Pakistani military.

communicating on social media with someone he believed to be in al-Qaeda. Alkattoul additionally stated that he told the person he believed to be in al-Qaeda that he (Alkattoul) had plans to blow up a synagogue but did not know if it was going to be in a day, a week, or year.

Alkattoul further told Employee-1 that although some things he said on social media were a joke, one thing that was not a joke was his wanting to plan an attack on a synagogue.

In the addition to the above-referenced information from the Complaint, the Government proffered to the Court at the initial appearance and bond hearing (the "Bond Hearing") the following additional information recovered from the Defendant's cell phone, excerpts of which are attached hereto as Exhibit B:

- the Defendant acknowledged deleting a social media account because he believed he was on an FBI list (*see* Ex. B, Fig. 1);

- he did not desire to stay in the West anymore and that he would like to go to Mali or Khorasan, where many Arab foreign fighters are located (*see* Ex. B, Figures 2-a, 2-b);

- the Defendant became radicalized over the past year and became a supporter of the Taliban, Al-Qaeda and ISIS (*see* Ex. B, Figures 3-a, 3-b);

- on September 11, 2022, the Defendant wrote not to make fun of 9/11 because nineteen good martyrs died on that day (*see* Ex. B, Figures 4-a, 4-b);

- on or about September 14, 2022, the Defendant stated to another user on an encrypted application, in substance and in part, that Jews and Christians are the same people, that they make the Defendant angry and that their throats should be cut (*see* Ex. B, Figure 5);

- the Defendant wrote in the same social media application that he intended to buy a gun when he moved out of his parents' home (*see* Ex. B, Figure 6);

- on or about November 2, 2022 – approximately one week before the Defendant's arrest – the Defendant wrote, "I simply want to kill all freshmen in my school" (*see* Ex. B, Figure 7)

**b. Arrest and Procedural History**

Law enforcement first approached and interviewed the Defendant on or about November 3, 2022.  On or about November 4, 2022, following the Defendant's release from a hospital where the Defendant underwent a voluntary assessment, federal law enforcement surveilled the Defendant around the clock until his arrest on November 10, 2022 due to the nature of the Defendant's threat and because of its credibility.

On November 10, 2022, in anticipation of the initial appearance, the Defendant was interviewed by a Pretrial Services Officer, who prepared a report recommending that the Defendant be released on home incarceration with location monitoring with the Defendant's father serving as a third-party custodian.[16]  Pretrial Services' report also barred computer usage and included a requirement for mental health testing and treatment.

However, on November 10, 2022, after the contested Bond Hearing, an Order of Detention was issued by U.S. Magistrate Judge Jessica S. Allen. *See* Mag. No. 22-8385 (ECF No. 7).[17]  Magistrate Judge Allen described her analysis of the issue of detention as follows:

> Again, I've reviewed the complaint, as I've highlighted at length here during the hearing.  I've considered the contents of Pretrial Services reports and their recommendations.  But I find that this case presents a strong case – that the defendant present[s] a strong case of danger to the community, as demonstrated by the underlying factual allegations and the nature and circumstances that form the basis of the offense[ ] charged in the complaint, again, coupled with the weight of the evidence.  And although it's not in the complaint, the proffer that the Government has made since he's been charged demonstrates that he has contemplated carrying out the threat.

Ex. C, 26:4-16.

On November 28, 2022, the Defendant filed a motion appealing Magistrate Judge Allen's order of detention.  ECF No. 1.  As set forth below, there has been no change in circumstances since the Bond Hearing, and the

---

[16] The Defendant's father reported that he is an Uber driver and works outside of the home for most of the day.

[17] The transcript from the Bond Hearing is attached hereto as Exhibit C.

Defendant remains a danger to society and a flight risk. The Defendant's proposed bail package is the same one that Judge Allen already rejected. Because detention is the only way to ensure the safety of the public and to guarantee the Defendant's appearance in court, his bail request should be denied, and he should remain detained pending trial.

## II.    Discussion

### a. Applicable Law

A district judge reviews a magistrate judge's decision regarding bail *de novo*. *United States v. Livingston*, 2016 WL 1261464, at *1 (D.N.J. Mar. 31, 2016) (Cecchi, J. (*citing United States v. Delker*, 757 F.2d 1390, 1394-95 (3d Cir. 1985)). "While the district court may find it useful to consider the decision and reasoning of the magistrate judge, the Court must make an independent determination regarding a defendant's eligibility for release on bail." *Id.*

The Bail Reform Act of 1984 highlights two criteria the Court is to consider when making determinations of release or detention: (1) risk of flight, and (2) safety to the community. When making a determination regarding the eligibility of a defendant for pretrial release, the Bail Reform Act directs the Court to consider: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) the history and characteristics of the person(s), and (4) the nature and seriousness of the danger to any person or the community posed by the defendant's release. 18 U.S.C. § 3142(g). If, after weighing these factors, the Court concludes that "no condition or combination of conditions will reasonably assure the appearance of the person as required" then bail should be denied. *See* 18 U.S.C. § 3142(e).

### b. The Defendant Poses a Danger to the Community and Presents a Risk of Flight.

The Defendant should remain detained because no condition or combination of conditions can reasonably assure the safety of the community. Rather than address the Defendant's dangerousness, the Defendant's motion instead asks this Court to acquit the Defendant now and order him released based on an implied likelihood of success at trial. While, indeed, the Defendant is presumed innocent unless and until proven guilty, the Defendant's words – made both online and in-person to law enforcement and medical personnel – show that the Defendant is more than a mere "paper tiger" with no intention of carrying out an attack. Rather, his statements show that he is a radicalized individual displaying numerous indicators of mobilization. The danger that the Defendant poses is twofold. First, there is a sufficient danger that he will *act* on his threats. Second, there is a sufficient danger that he will *continue to convey threats*, which is also a harm to the community that

is sufficient to necessitate detention.  *See United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("The term 'danger to the community' was 'not meant to refer only to the risk of physical violence.'"); *United States v. Milan*, 4 F.3d 1038, 1047 (2d Cir. 1993) ("The language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community.").

### i. Nature and Seriousness of the Charge Against the Defendant

The first factor the Court must consider under Section 3142(g) is the "nature and circumstances of the offense charged, including whether the offense is a crime of violence." 18 U.S.C. § 3142(g)(1).  Under a plain reading of the statute, the Court must consider all relevant conduct related to the charged offense.  The nature and circumstances of this case make clear that this case involves much more than an isolated incident or a lapse of judgment.  The Defendant not only drafted a manifesto containing a threat to attack a synagogue, but he has made numerous statements – both online and in-person – expressing a sincere desire to commit violent acts against Jewish people and homosexuals.  Additionally, just two days before members of the FBI approached the Defendant, he stated a desire to kill all the freshmen at his school.  Thus, the Defendant's violent inclinations are not merely limited to those who are targeted in the threat that brings about this charge.  Rather, the Defendant has displayed extremely erratic behavior that shows he is inclined to commit violent acts upon almost anyone in the community, regardless of race or religion.

The seriousness of the Alkattoul's criminal conduct is apparent not only in the Complaint, but also in other statements recovered from his encrypted messaging applications, his cell phone. and from statements he made to law enforcement and medical personnel in the days immediately preceding his arrest.  His conduct and statements are extremely disturbing.  In the manifesto itself, the Defendant stated, "I am the attacker," "Many more attacks like these . . . will come," "the motive for the attack is hatred towards Jews," and "I support terrorism."  Additionally, he admitted to Individual-1 that his manifesto was in the context of "an attack on Jews."  In addition to sending Individual-2 the manifesto, he also sent Individual-2 a voice recording in which he stated, "With God's permission, the Jews will be frightened; the promise is near."

When the FBI became aware of the threat and the manifesto, the agency issued an immediate state-wide alert via Twitter warning of a "credible threat"

to New Jersey synagogues.[18]  Additionally, once the Defendant was identified, the FBI began 24-hour surveillance of the Defendant, which continued for nearly a week until his arrest, because the FBI was concerned that he might carry out an attack.  Of particular concern to the FBI was the fact that the manifesto was written as if the Defendant had already carried out the attack. This suggests that the Defendant's intent was to leave the manifesto behind to be found after he carried out such an attack, likely resulting in his own death or arrest, similar to the manifestos left behind by Payton Gendron (the Buffalo shooter)[19], Brenton Harrison Tarrant (the Christchurch, New Zealand shooter)[20], Dylann Roof (the Charlestown, South Carolina shooter)[21], and Patrick Crusius (the El Paso shooter).[22]  Indeed, the International Centre for Counter-Terrorism recently noted the rising trend of violent extremists using terrorist manifestos in conjunction with attacks.[23]

In considering "the nature and circumstances of the offense charged," this Court should also consider whether the Defendant is charged with committing a crime of violence, as defined by 18 U.S.C. § 3156(a)(4)(A).  *See* 18

---

[18] *See FBI Warns New Jesey Synagogues of "Credible Threat*, Reuters.com (Nov. 3, 2022) *available at* https://www.reuters.com/world/us/fbi-receives-credible-information-threat-nj-synagogues-tweet-2022-11-03/

[19] *See The Buffalo Attack – An Analysis of the Manifesto*, International Centre for Counter-Terrorism (May 18, 2022) *available at* https://icct.nl/publication/the-buffalo-attack-an-analysis-of-the-manifesto/

[20] *See The Shooter's Manifesto was Designed to Troll,* The Atlantic (Mar. 15, 2019) *available at* https://www.theatlantic.com/technology/archive/2019/03/the-shooters-manifesto-was-designed-to-troll/585058/

[21] *See Photos of Dylann Roof, Racist Manifesto Surface on Website*, NPR (Jun. 20, 2015) *available at* https://www.npr.org/sections/thetwo-way/2015/06/20/416024920/photos-possible-manifesto-of-dylann-roof-surface-on-website

[22] *See Minutes Before El Paso Killing, Hate-Filled Manifesto Appears Online*, N.Y. Times (Aug. 3, 2019) *available at* https://www.nytimes.com/2019/08/03/us/patrick-crusius-el-paso-shooter-manifesto.html

[23] *See* Jacob Ware, *Testament to Murder: The Violent Far-Right's Increasing Use of Terrorist Manifestos*, International Centre for Counter-Terrorism (Mar. 2020) *available at* https://www.icct.nl/app/uploads/2020/03/Jaocb-Ware-Terrorist-Manifestos2.pdf

U.S.C. § 3142(g)(1); § 3156(a)(4)(A) (a crime of violence is "an offense that has an element of the of the offense the use, attempted use, or threatened use of physical force against the person or property of another."); *see also United States v. Bowers*, 432 F.3d 518, 520-21 (3d Cir. 2005). The Third Circuit has yet to take a position whether 18 U.S.C. § 875(c) is a crime of violence as defined under § 3156(a)(4)(A). But, other courts have held that transmitting a threat to injure in interstate or foreign commerce is a crime of violence. *See United States v. Mjoness*, 4 F.4th 967, 973-982 (4th Cir. 2021) (holding that 18 U.S.C. § 875(c) is a crime of violence for purposes of § 924(c)); *cf. United States v. Chapman*, 866 F.3d 129, 135 n.8 (3d Cir. 2017) (in addressing § 876(c), a statute that is identical in all material respects to § 875(c), holding that § 876(c) is divisible).  Lower courts within and outside of the Third Circuit have "universally held that the crime of transmitting a threat in interstate commerce under 18 U.S.C. § 875(c) is a crime of violence."  *United States v. Jackson*, 2022 WL 716968, at *2 n.4 (W.D. Pa. Mar. 10, 2022) (analyzing § 875(c) in context of Bail Reform Act) (*citing United States v. Santoro*, 359 F. Supp. 3d 122, 128 (D. Me. 2019) (communicating a threat to injure another person is a crime of violence for detention purposes)); *United States v. Kaetz*, 2021 WL 37925, at *4 (D.N.J. Jan. 4, 2021) (defendant conceded § 875(c) was crime of violence under § 3142(g)(1)); *United States v. Christy*, 2020 WL 2794617, at *3 n.5 (M.D. Pa. May 29, 2020) (§ 875(c) is "clearly" a crime of violence under the Bail Reform Act); *see also United States v. Choudry*, 941 F. Supp. 2d 347, 351 (E.D.N.Y. 2013) ("[C]ommunicating a threat in violation of 18 U.S.C. § 875(c) constitutes a 'crime of violence,' warranting detention under the Bail Reform Act.").[24]

In fact, courts have routinely found comparable offense conduct—arguably less serious than the conduct charged here—to weigh in favor of detention on the ground that the 18 U.S.C. § 875(c) crime charged was sufficiently serious.  *See, e.g., United States v. Kabbaj*, Crim. No. 16-365, U.S. Dist. LEXIS 125226, 2016 WL 11660082 (E.D. Pa. Sept. 12, 2016) (defendant sent emails and submitted court filings specifically warning of death and decapitation upon his enemies, making 9/11 "look like a picnic in the park," inciting "massive violence against the entire homosexual community," and calling upon Muslim women to attack a United States Magistrate Judge); *United States v. Capriotti*, Crim. No. 21-16, 2021 U.S. Dist. LEXIS 12223, 2021 WL 229660 (N.D. Ill. Jan. 22, 2021) (defendant left threatening voicemail for member of the House of Representatives; defendant had a history of threatening statements, but had never acted, and stated to law enforcement that "he meant no 'ill will'" and "was just f***ing with" the members of

---

[24] Defendant remarks in a footnote that a crime that can be committed recklessly cannot count as a crime of violence after *Borden v. United States*, 141 S. Ct. 1817 (2021).  *See* Def. Motion at 4 n.3.  But, the Third Circuit has never held that § 875(c) can be satisfied by a recklessness *mens rea.  See, e.g., United States v. Elonis*, 841 F.3d 589, 601 (3d Cir. 2016).

Congress"); *United States v. Fratus*, Crim. No. 20-270, 2021 WL 2823070 (E.D. Pa. July 7, 2021) (defendant with history of threats and assaults sent two racist and anti-Semitic emails as well as death threats to police commissioner).

Additionally, the Defendant faces a substantial sentence if convicted, which, in this case, is even more significant because the Defendant has never previously served a prison sentence. While the Government's investigation is ongoing and there remains the possibility that the Government may bring additional charges against the Defendant, even a preliminary Guidelines analysis shows that the Defendant potentially faces a 41 to 51-month prison sentence if convicted. Specifically, even if the current charge is the only charge for which the Defendant is convicted, after accounting for the base offense level of 12 (*see* U.S.S.G. § 2A6.1(a)(1)), offense-level enhancements are likely to apply, such as the 6-point increase for Specific Offense Characteristic 2A6.1(b)(1), as this case involves "conduct evidencing an intent to carry out such threat," and the 4-point increase for Specific Offense Characteristic 2A6.1(b)(4), as the Defendant's threat resulted in a "substantial disruption of public, governmental, or business functions or services." Thus, the applicable offense level would be 22.

Accordingly, the Government respectfully submits that the nature and circumstances of the charged offense weigh in favor of detention.

### ii. Weight of the Evidence Against the Defendant

A significant sentence is certainly sufficient to motivate the Defendant to flee. That is particularly the case when, as here, a conviction potentially giving rise to such a sentence is no empty threat, but rather, the likely outcome based on the strength of the evidence. Although the merits of the Government's case are not ultimately a matter to be determined on a bail application, when viewing the Government's evidence through the lens of a bail determination pursuant to Section 3142, the weight of the evidence against the Defendant favors detention. The Government's case against the Defendant is strong, and accordingly, this factor also weighs in favor of detention. *See, e.g.*, *United States v. Briggs*, 697 F.3d 98, 102 (2d. Cir. 2012) (noting the fact that defendant was captured in intercepted communications demonstrated the strength of the Government's case).

While this is an ongoing investigation, the Complaint provides an in-depth description of several key categories of evidence that will support the Government's claims that the Defendant transmitted a threat in interstate commerce. First, the threat itself is contained within the manifesto, which the Defendant admitted he drafted. The words of this written threat, a specific attack on Jewish synagogues, speak for themselves. Second, evidence recovered from the Defendant's cell phone and social media accounts show that

the Defendant transmitted the threat over the Internet, thus the Defendant transmitted the threat in interstate commerce. *See United States v. Morales*, 272 F.3d 284, 288 (5th Cir. 2001) ("The language of 875(c) does not require that the threat be made directly to the intended target; it simply prohibits 'any threat to injure the person of another' made in interstate commerce."); *see also United States v. Kabbaj*, Crim. No. 16-365, 2016 U.S. Dist. LEXIS 125226, 2016 WL 11660082 (E.D. Pa. Sept. 12, 2016) (while analyzing the weight of the evidence for a bail hearing in an Internet threat case, reiterating that "'direct communication to the person threatened is not required for a conviction under the statute'") (quoting *D'Amario v. United States*, 403 F. Supp. 2d 361, 378 (D.N.J. 2005)). Lastly, the Defendant's own statements, both within the manifesto and contained elsewhere on his cell phone and within encrypted messaging applications, speak for themselves with respect to his intent to inflict injury.

Moreover, the encrypted applications, by their very design, were intended to shield the Defendant's communications from detection by law enforcement and is clear evidence of the Defendant's criminal intent. Law enforcement recovered several messages by the Defendant in which he expresses a concern that law enforcement could be monitoring him. *See* Ex. B. Notably, the Government has not included evidence currently being evaluated by the FBI that would expand the scope of the case to other charges.

Again, although the Defendant is, of course, presumed innocent at this stage of the proceeding, the evidence against him is strong and supports detention.

### iii.  History and Characteristics of the Defendant

Any clear view of the conduct and circumstances present in this case, including the myriad of facts presented in a lengthy Complaint and the staggering quantity of violent, hateful, and anti-Semitic statements made by the Defendant, lead to an unavoidable conclusion that the Defendant is a danger to the community. He himself admitted that he has been "radicalized" over the last year. Further, the Defendant's personal characteristics, including his dual-citizenship status with Jordan and his stated interest in leaving the United States to join a foreign terrorist organization, show that he also presents a risk of flight. The Defendant's attempts to diminish the risks presented by his statements are unavailing. As set forth in more detail below, the Defendant possesses several "mobilization indicators" as defined by the National Counterterrorism Center ("NCTC") under the Office of the Director of National Intelligence ("ODNI").

According to the NCTC, there are at least 42 indicators that violent extremists display prior to mobilizing for an attack.[25]  The Defendant has displayed at least the following 14 indicators:

3. Disseminating one's own martyrdom or last will video or statement (for example, a pre-attack manifesto or final statement).

5.  Identifying—in person or online—specific details of an intended violent activity, including target(s), time frames, and participant roles.

8.  Communicating intent to engage in violence or a direct threat with justification for action, particularly if presented as necessary or inevitable, in person or online.

10.  Planning or preparing to travel abroad to join violent extremist organizations, seek training, or engage in a conflict zone.

12.  Seeking or claiming religious, political, or ideological justification or validation for a planned violent act.

17.  Increased use of online concealment tactics (for example, deleting, hiding, or manipulating social media or other online accounts to misrepresent location or hide group membership, contacts, or activities) in support of planning a specific act of violence.

18.  Communicating directly with or seeking to develop a relationship with violent extremists, or being contacted directly by them, for suspected criminal purposes.

24.  Creating, joining, or implying membership/association— in person or online—with violent extremists for the purpose of furthering violent activity.

28.  Professing intent to harm law enforcement if law enforcement takes action or a statement of intent to harm others (typically ideological opponents) if confronted.

30.  Threatening specific violence against a particular physical target, especially in response to current news reporting on

---

[25] *See US Violent Extremist Mobilization Indicators* (2021 Ed.) *available at* https://www.dni.gov/files/NCTC/documents/news_documents/Mobilization_Indicators_Booklet_2021.pdf (last visited Dec. 8, 2022).

political and legislative issues or other flashpoint events that speak to one's ideological concerns.

31.  Threatening violence toward specific individuals, including civilian, government, law enforcement, or military personnel.

32.  Producing, promoting, or extensively consuming violent extremist content online or in person, including violent extremist videos, narratives, media, and messaging for suspected criminal purposes.

34.  Expressing acceptance of violence as a necessary means to achieve ideological goals (for example, communicating a desire for revenge against ideological opponents) and saying that nonviolent means are ineffective or unavailable.

36.  Praising, or researching to emulate, past successful or attempted attacks or attackers.

Notably, the Defendant admitted to law enforcement that he had been radicalized within the last year, and he admitted to communicating with al-Qaeda individuals overseas.  When asked by law enforcement how likely it was that he would carry out an attack, he stated that he was "50/50" as of the week of October 29, 2022.

When the Defendant submitted to a voluntary medical evaluation, he told medical staff that he supported ISIS and al-Qaeda.  He told a hospital employee that he had plans to blow up a synagogue, but he did not know if it was going to be in a day, a week, or a year.  He told that same employee that although some of the things he stated on social media were a joke, one thing that was "not a joke" was his wanting to plan an attack on a synagogue.

Finally, numerous recent messages were recovered from the Defendant's phone that suggest he is a danger to the community and indicate possible mobilization.  On or about August 30, 2022, he acknowledged deleting a social media account because he believed there was a good chance he was on an FBI watchlist.  Ex. B, Figure 1.  On or about September 10, 2022, he stated that he had "no desire to stay in the west anymore."  Ex. B, Figure 2-a.  When asked where he would go, the Defendant responded, "Maybe Mali or Khorasan," and acknowledged that both of those locations get a lot of foreign fighters.  Ex. B, Figure 2-b.  Also, on or about September 11, 2022, he acknowledged that he became a supporter of the Taliban around October 2021, and then started supporting al-Qaeda and ISIS between December 2021 and February 2022.  Ex. B, Figure 3-b.  On or about September 11, 2022, he admitted to showing

19

ISIS beheading videos to students in his class, and that same day stated, "Do not make fun of 9/11.  Because 19 good martyrs died on that day."  Ex. B, Figure 4-a, 4-b.  On or about September 14, 2022, he stated, "Jews and Christians are literally the same people.  And they all piss me off and I think we should cut their throats."  Ex. B, Figure 5.  Finally, on or about November 2, 2022, just two days prior to his arrest, the Defendant stated, "I simply wanna kill all freshman in my school."  Ex. B, Figure 7.

These statements are extremely troubling and are a clear indication that the Defendant is a danger to the community, including to the students in his school.  If the Defendant is released with the conditions proposed by the Defendant and Pretrial Services, the Defendant will be back at home—the same place where he drafted the manifesto, transmitted the threat, and made many of the other aforementioned violent statements.

The Defendant's response to the allegations in the Complaint and to all of the proffered evidence is to ignore them, and to instead point to cases in which defendants were acquitted of 18 U.S.C. § 875(c) charges, cases that apparently did not involve defendants with similar histories and characteristics of this Defendant.

While location monitoring may help prevent flight, or at least allow Pretrial Services to know if the Defendant is attempting flight, location monitoring cannot prevent the Defendant from carrying out a random act of violence if he is motivated to do so.  Nor are there any conditions of supervision that can prevent the Defendant from continuing to access the Internet to transmit additional threats.  While the proposed conditions strive to restrict his ability to access the Internet, "[t]he Court would not be able to effectively supervise the Defendant's access to all means of digital communication – pretrial professionals cannot be expected to follow him everywhere and determine whether he is using his own device (or someone else's device) or directing others to communicate plans to flee, or to communicate threats." *United States v. Kane,* Mag. No. 20-5054, 2020 U.S. Dist. LEXIS 60238, 2020 WL 1660058, at *4 (W.D. Wash. Apr. 3, 2020) (case involving online threats); *see also Kabbaj,* 2016 WL 11660082, at *14 ("Even if possible for us to condition the release of [the defendant] so he cannot issue statements through the internet, there is no way for us to be certain [the defendant] cannot use alternative mediums to incite others to dangerous action.").

In sum, the serious nature of the offense, the weight of the evidence against the Defendant, his nature and characteristics, and his risk of flight all warrant detention.  The Government believes there is no bail package that can be crafted for the Defendant who has a clearly demonstrated a desire to inflict large scale violence, not only on the target of his threat, but on others as well.

### III.    Conclusion

There is no condition or combination of conditions that can reasonably assure the safety of the community.  To the contrary, there is clear and convincing evidence that the Defendant poses a real and significant threat to the community which cannot be overcome by any combination of release conditions.  Further, there is a preponderance of evidence that if released, the Defendant poses an actual risk of flight.  Accordingly, the Defendant should be detained pending trial.

Respectfully submitted,

PHILIP R. SELLINGER
United States Attorney


_s/ Christopher D. Amore_____
CHRISTOPHER D. AMORE
BENJAMIN LEVIN
Assistant United States Attorneys

cc:    Rahul Sharma, Esq.
       Timothy Donahue, Esq.
       Evan J. Austin, Esq.